We'll hear argument next this morning in Case 09-1159, the Board of Trustees of Stanford v. Roche Molecular Systems. Mr. Ayer. Thank you, Mr. Chief Justice, and may it please the Court. The Bayh-Dole Act sets forth a comprehensive disposition of rights and inventions made by nonprofit organizations and small business organizations under Federal funding agreements. That disposition specifically defines the rights of inventors, and it puts them in the third position behind the contractor, the nonprofit contractor, and behind the government, and specifically says that the inventor may only receive rights, that is to say, take title, when the contractor has declined to take title or defaulted in some respect, and the government itself has likewise declined to take title. In this case, Roche's sole claim rests on an assignment from an inventor. Who was at that time, I think without question, a Stanford employee who was working on a project under a Federal funding agreement. Had not been an employee. If it had been an independent contractor who was working in combination with the university, how does this automatic vesting? Well, Your Honor, the Act deals specifically with independent contractors, and the regulations at least do, and they indicate that the contractor in that instance, if in fact working on a Federally funded project, would step into the shoes of the contractor, but I don't believe it would affect the outcome in terms of whether it would be a Bayh-Dole invention. The critical fact here is that the inventor was working on a project that was already funded. His work at CITUS was part of that project, and the net result was what if it's not a Bayh-Dole invention? Ginsburg. That seems to be a factual dispute, so maybe you can be clear on that. According to CITUS or Roche, at the time that this scientist came to CITUS to work, there was no Federal funding. The Federal funding for this project, the Stanford project, came about after the scientist had spent his 9 months at CITUS, at least that's the picture that they draw. The Federal they got their assignment from the scientist at a time when there was no Federally funded project. That's what they say, Your Honor, and I would submit that is plainly not correct. We deal with this at pages 21 and 22 of our yellow brief, and we specifically talk about the fact, there's several critical facts here. One is that the article which was written about the work at CITUS, the JID article, at page 135 of the joint appendix, specifically has a footnote indicating that the work reported on, that is the work at CITUS on the assay, was funded by the two specific grants in issue. Dr. Merrigan, who is the head of the lab at Stanford that Dr. Haladny worked in, talks in his declaration at 98 and 99 of the joint appendix, specifically talks about how Dr. Haladny's work was part of the AIDS research center at Stanford and part of an AIDS clinical trial at Stanford, and all of that work was Federally funded. Scalia. Just as a hypothetical, suppose it was, as Justice Ginsburg suggested, or indeed suppose this individual, even before he was employed by Stanford at all, much less employed by a Stanford project funded by the Federal Government, entered into this kind of an agreement with somebody that he had been working for. How would it work? Well, I would look very carefully at the facts, and I don't want to speak loosely and categorically about the facts. But what I will say is that in a situation where, and this is very clearly true, in a situation where prior work is done by persons who are, to start with, a clearer set of facts, not affiliated with the university, and they, let's say, that person conceives of an invention, and that later the university takes that conception of an invention and reduces it to practice, the conception by a person who is not a university employee, if there's no university person involved in the conception, then it can't be an invention of the contractor because you can't be an inventor without being part of the conception. So that's a variation on Your Honor's question, but it's a clear example where BIDOA would not apply. Scalia. But how does that change when you alter the hypothetical so that he was already an employee of Stanford, but was not working as an employee of Stanford when he was at this other company? You could still say that Stanford was not the inventor. Well, you would — I think you are now in a zone where one of the things that has to be considered is the equitable character of any assignment of a future interest, that is to say a future invention, because if in fact what was assigned was, as here, the possibility that there might at some future time be an invention, then equitable considerations come into play. And one of the equitable considerations, we think the one that is of paramount significance, is the fact that the Congress of the United States has said in the context of Bayh-Dole that when the United States invests money in research, it wants certain things to happen that are very carefully set out in the Bayh-Dole Act. Kennedy. Could you tell me, assume no Federal Act, let's just talk about two in — or parties that are not involved with the Federal Government. Inventor agrees to assign to A, then inventor, in fact, assigns to B, then A gets the patent. Well, it depends what's assigned, Your Honor. If B is a bona fide purchaser under 35 U.S.C. 261, then B would prevail. If B is not a bona fide purchaser, and that can only apply under 261 where you are dealing with an assignment in law of a patent or a patent application, then I think you are in the difficult zone where there are two competing interests in the future possibility of an invention, and I don't know that I can, without knowing all the facts, even intelligently try to tell you what would end up happening. In this case, if you do not prevail on your principal argument, have you preserved the point that the assignment to Cetus was contrary to public policy? I think we have, Your Honor. I think essentially, I would say, frankly, that that is at the heart of our core argument and of the government's argument, and it is that, as the trial court here held and as we've said in our brief several times, the inventor, because he is working here at the time of the assignment on a Federally funded project as an employee of Stanford University, is essentially working on something covered by Bayh-Dole. And being covered by Bayh-Dole means that he lacks the power to transfer title to this future invention to someone else, because the statute has already spoken for it. Ginsburg. Mr. Ayer, I think the Federal Circuit emphasized a distinction between the scientist saying, I will assign, which was the language used in the agreement with Stanford, and I hereby do assign. And it seemed that that was critical to the Federal Circuit's decision. They say this had a whole bunch of cases. The suggestion seems to be that if Stanford had said, I hereby do assign, there would be no case because Stanford would have been first in time. Well, one interesting thing about that discussion is that the very first case that we know anything about, that we're aware of, making that distinction and relying upon the immediate effect of an assignment using the words, I hereby assign, was the Film Tech case in 1991. That was two years after the events in this case. So how was Stanford supposed to know that that fine distinction was going to be made? We think the critical issue here is whether the inventor, while working on a Federally funded project as an employee of the contractor, and there's no doubt that his work at Cetus was part of his Stanford research, all you have to do is look at pages 16a to 18a of the petition appendix for the court of appeals decision or pages 62a and 69a for the district court opinion. It's perfectly clear that everyone knew he came to Cetus to advance his work on his Stanford research, which was, in fact, funded, as we show, at pages 21 and 22. And by the rule of fact, what did he do? Alito What have universities been doing for the last 30 years? Have they been proceeding on the assumption that Title II inventions vested in them automatically, or have they been very careful about getting assignments from all of their employees? Shanmugam Universities, and I think everybody engaged in research, is generally careful. They have policies in place to get assignments. And there are lots of reasons why that would be true. It was true before the Bayh-Dole Act. It's a wise and prudent practice to have an understanding with your employees about who is going to own what. Kagan Do those policies ever distinguish between Federally funded projects and non-Federally funded projects? Shanmugam I don't know about the universe of them. I know that the Stanford policy in this case, relevant at this time, was a policy that indicated employees could retain title in many instances, but not where Federal law, applicable law says that they can't retain title. And in that sense, they do. But those policies, I think, are very clearly, in virtually every case I know anything about, policies that are signed by an employee pretty much the day they walk in the door, as I think was the case here with Dr. Haladny back in 1988. And it's a general understanding of what the expectations are. And I don't want to here be heard to say at all that we think this is an unwise thing or that it isn't a good thing that it goes on. It's a very good thing that it goes on, because people need to understand what the situation is. The critical issue is whether in the event that that fails to happen for some reason or that there's a slip-up here where a fellow going to visit somewhere on the first day there has something put under his nose called a visitor's confidentiality agreement, which he happens to sign, and down in paragraph 2 it talks about assigning away everything that he ever might do as a consequence of this. The point is that in that situation, you can't have the interest of the United States, which is the critical paramount interest in this case. I want to make that very clear. It's the interest in the United States when it spends millions and billions of dollars on research, in having that research handled in a certain way, having the fruits of it dealt with in a certain way, and having it go where Congress says it should go. Now, the critical issue is that it's very, I mean, you're cloaking yourself in the interest of the United States, but we're going to hear from their lawyer shortly. Do you ever have different arrangements with respect to the assignments, depending upon who the researcher is? I mean, I suppose, I would have supposed there are very prominent researchers that you would like to have at Stanford, and you'd be willing to negotiate less than a requirement of full assignment of their inventions in order to get that person there. I don't know if the — I wouldn't tell you, Kennedy. In other words, you'd be willing — wouldn't you be willing to sell the interests of the United States down the river to get — to advance your interests? Well, we would not, I think, be willing, and I don't think anybody would be willing to break the law. And we would submit that that's what's going on here. Well, but I thought the law meant that the United States got whatever interest the contractor got, right? And it doesn't say what the contractor can or can't do with respect to the employees it has. The statute defines a universe of covered cases, which are inventions of the contractor which we think the other side uses those words to argue that inventions of the contractor are only the ones the contractor already owns by virtue of the contract. Unless the word retained, don't forget that, too. Right. Those two provisions are essentially their argument for narrowing the universe of inventions that is covered. And I want to just say at the outset, the critical thing about narrowing the universe of inventions covered is that it narrows the universe of inventions in which the government's rights to, number one, its self-received title under several provisions of the Act, number two, itself to enforce a whole series of requirements under 202C4567 and a variety of other provisions, to itself march in and do things. When you define out of that category instances where inventions exist and were produced with Federal money, then you're limiting the coverage of the government's interests. But on the two provisions at issue, we think clearly they do not mean what the other side says they mean. The word invention of someone is conventionally understood. If you hear the lightbulb was an invention of Thomas Edison, you don't think Thomas Edison owns the patent. You think he invented it. The same thing is true, even though. Alito, there are two things that cut very strongly against your argument, but there are many things that cut in favor of it. But the two things that seem to me to cut pretty strongly against your argument are, first, that it has long been the rule that inventors have title to their patents initially, even if they make those inventions while working for somebody else. And the second is that you are relying on a provision that says that the nonprofit organization may elect to retain title, which means hold on to a title that the organization already has. There's just no accepted definition of the word retain that corresponds to the meaning that you want to assign to that word. Retain does not mean obtain. Thank you, Your Honor. Can I answer that? Basically, what I would say is on the first point, you're quite correct, obviously, that that's the general rule that inventors receive title. However, just in this case, in this fact pattern, the array of so-called vesting statutes that predated the Bayh-Dole Act throughout the 30 years in between are statutes that specifically, in most instances, without any discussion of an assignment, simply vested title directly in the United States. So Congress clearly had the power to do that, and they did it, and no one ever seriously argued that they couldn't. Scalia. But this is investing it in the United States. This is speaking of the university retaining title. If the government was going to make such a huge change from normal patent law, where the inventor owns his invention until he assigns it to his employer, why wasn't that set forth clearly? All they needed was one paragraph that says when you're working on a government-funded project, you have no right to your invention as an employee. It automatically vests in the university. I would have expected that to be set forth very clearly if they were making such an immense change in patent law. Well, Your Honor, I would take exception to how immense it is, given the prior history in which the government simply took title to these very same inventions. But on the issue of the meaning of the word retain, that's actually a word that has a lot of potential connotations. The one thing we can be sure of here, without any doubt, is that it doesn't mean that you had to have ownership before, because in Section 202d of the Act, the Act specifically talks about the inventor's opportunity to itself be considered for retention of title. And everyone agrees that that phrase is one that never applies when the inventor already has title. So retain doesn't mean that. We would submit that what the word retain means is that you have to have ownership before. Scalia. Excuse me. I lost you. Go over that again. Okay. 202d. Yeah. Where is that? 202d is the section or where is it in the book? Okay. It is on page 9A, and it says that if a contractor does not elect to retain title — 9A of the blue brief. Got you. Does not elect to retain title to a subject invention, in cases subject to this section, the Federal agency may consider, and after consultation with the contractor, grant requests for retention of rights by the inventor. On 38 of the red brief, you will see the other side vehemently arguing that that only applies when the inventor doesn't have title to start with. So you can't have retain mean one thing in one place and one place mean one thing in the other. Your Honor, if I could, I would like to save the rest of my time. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court, as the Chief Justice's question suggests, although Stanford and the government's interests are aligned in this case, that won't invariably be so. And the government has perhaps different reasons for supporting the same position that Stanford is supporting. Kagan. Mr. Stewart, could I ask you just a factual question? When the Federal government contracts with universities or other non-profits, does it require those universities to get assignments from their employees, and if so, how? The government-wide regulation that — which was promulgated by the Department of Commerce and which identifies certain things that should be in the funding agreements, it does not require an assignment of title from the university's employees. The regulation does require the university to make assurance — give assurances that it has contractual obligations from its employees to cooperate in filing the documents necessary to process a completed patent application. But that would be necessary. So why doesn't the Federal government just require assignments from employees to the university? Well, under our theory — first, under our theory, it wouldn't be necessary, because the statute itself would give the university title. And second, under Respondent's theory, I think there is a substantial doubt whether it would be permissible. That is, Respondent's vision of the Bayh-Dole Act is that Congress imposed elaborate requirements on inventions as to which the contractor has obtained title from the researcher, but that Congress, left entirely to private ordering, was indifferent as to whether the contractor took title in the first instance. And if that view of the statute were accepted, there would at least be a substantial doubt whether the Commerce Department could promulgate regulations that would validly require the contractor to do something that, in Respondent's view, Congress left to private ordering. Now, I don't want to argue that point too vigorously, because certainly if this Court holds that assignments from the inventors are required, we would like to have the opportunity to require the contractor to get them, but it isn't clear to me how you would get there if Respondent's view of the statute were accepted. Scalia. I don't understand that. Why can't the Federal Government just say we are not going to fund your project unless you get assignments of inventions by all the employees working on it? What's the problem? We would certainly like to have the opportunity to do that, but to use an analogy, the Bayh-Dole Act is triggered by voluntary choices of small businesses and nonprofits to accept Federal funds. Scalia. And by the Federal Government's voluntary decision to provide funds. I mean, certainly you can condition your grant of funds on that. I really don't see the problem. Stewart. Certainly, if this Court, as I say, holds that an assignment from the inventor is required, then we would like to be able to have regulations that would require that to be done. Sotomayor. Sotomayor, does the, as a practical matter, when a university is seeking a patent, doesn't it have to identify the inventors and get their, proof of their assignment before it can claim ownership of the patent? Well, typically it would, it would certainly have to identify the inventors on the patent application. And typically the university would, whether it felt an assignment was legally required or not, it would attempt to. Sotomayor, that's a different question than mine. Does the patent office require the assignment for purposes of showing ownership of the patent? Not in most cases, but not necessarily. There's a provision of the Patent Act, 35 U.S.C. 118, which says that if an inventor refuses to execute an assignment or cannot be found after reasonable diligence, a person to whom the patent application has been assigned or to whom the inventor has promised to assign it, or some other person with a sufficient proprietary interest in the invention, can file its own patent application, it will identify the inventor as the inventor, and it will provide documentation that establishes its own interest in the invention. And this is the kind of thing that we might in some instances have to do with respect to Federal employees. That is, there's an executive order that says basically, as a condition of Federal employment, if an inventor fails to execute an invention on the job, the Federal government is entitled to take title to it. Sotomayor, that all sounds to me like there is an assumption about assignments even in the patent law, that you the section that you just recited to me says a promise to assign will get you an assignment if the inventor won't give it to you. It could be a promise. I mean, there are two different things. It could be a promise to assign at the formation of the employment arrangement, where the employee is not — doesn't necessarily have in mind any particular invention, but he exercises a contractual commitment to assign to the employer at a later date. Ginsburg. Is that what we're dealing with in this case? I mean, there was an agreement, a standard Stanford agreement that said I will assign any patent. He agreed to that, and he also agreed that he would not enter into any other arrangement that placed him in conflict with the agreement he was making. So why isn't that the beginning and end of this case? I mean, it's — there are very important questions presented, but the Federal Circuit said everything turns on the difference between I will assign and I hereby assign, that Cetus would have come second in time, therefore would not have prevailed over Stanford, but for the Federal Circuit said one is a future conveyance and one is an immediate conveyance, the other. Well, leaving aside the question of whether that's right or wrong as a matter of contract law, our view is that it was not within Stanford's power to essentially convey to the inventor or allow the inventor to retain title, and that's clear in a couple of different respects. The provision that Mr. Ayer was reading, section 202d, says that if the contractor does not elect to retain title, then the inventor can make a request for retention of title, which the agency will consider after consultation with the contractor. So the statute doesn't say to the contractor that the inventor can't retain title. Kennedy, but Justice Ginsburg's question and I have the same concern is why can't we resolve this case in a simple way? What you're asking for, based on the submissions to us of the Mekes, of the Mekes briefs, means a very great change in how patents are held. If we can resolve this case on a very simple contract base, why not do it? Well, if the Court were to hold that the agreement made with Stanford took precedence over the contractual commitment to CITUS, based either on general contract law or on the view that Bayh-Dole would prohibit the enforcement of the agreement with CITUS under these circumstances, that would satisfactorily resolve the case from the government's perspective. But the one thing that's not clear to me is whether this is a Stanford-specific problem or is it a more general problem? In other words, are there many universities that have agreements like Stanford's that would be subject to the Federal Circuit's ruling, or is this just an example of one university that, unfortunately, has a bad agreement? I think there are probably a lot of universities that use this language. And, indeed, as one of the Mekes briefs points out, it's very natural to distinguish between a present assignment and a promise to assign in the future with respect to an invention that now exists. It seems a little ethereal to distinguish between a present assignment of an invention that has not yet been created and an agreement to assign that in the future. Now, certainly, universities could change their contracts if that was what was necessary. I think one of the concerns that the government has, and this was hinted at by the Chief Justice's question, is that we're worried not just about what can be done to universities, but what universities could do to us. That is, it's standard university practice to say employees agree to assign their inventions to the university and the two parties will divide the royalties. And if that is done, then even under Respondent's view, it becomes a subject invention and the university's commercialization of the invention is subject to all the requirements of Bayh-Dole. Alito, is that the case that at least some components, possibly many components of the Federal government, for the last 30 years have been proceeding on the assumption that assignments were necessary? The grants here were from NIH, isn't that right? Right. And one of the Amicus briefs points out that the NIH compliance guidelines say, by law, an inventor has initial ownership of an invention. However, awardee organizations are required by the Bayh-Dole Act to have in place employee agreements requiring an inventor to assign or give ownership of an invention to the organization. The NIH document is internally inconsistent, because it says at the beginning that title passes automatically to the university, but then, as you say, it says later on that an assignment is required, but that the contractor is required to get it. And I think some people have proceeded on that assumption, because it never, so long as assignments were in place and were enforceable, it never really mattered whether they were needed. But to continue my answer to Justice Kagan, I wanted to point out, under Respondent's theory, universities could make a conscious, calculated decision that, rather than obtain an assignment for their inventors, they would simply agree with the inventor that royalties would be split in the same manner as previously, but that the inventor would retain title and, perhaps with the assistance of the university's technology transfer office, would negotiate with commercial entities, and the effect would be to contract around Bayh-Dole. Commercialization could occur without complying with any of the prerequisites. Roberts. Roberts. Thank you, Mr. Stewart. Mr. Fleming. Mr. Chief Justice, and may it please the Court. The Bayh-Dole Act had the laudable objective of taking inventions off of government shelves and putting them into the market, and it succeeded. But it did not change the longstanding rule, dating back to this Court's decisions in Hapgood and Du Bois, that title to an invention vests in the inventor subject to assignment, not in the inventor's employer. We submit that in light of this long-settled rule, which Congress nowhere purported to change, the Act should be given its straightforward meaning. Is there any reason that the Federal Government can't just say from now on, we're not going to give any money to Stanford or anybody else until they have an agreement making clear that the inventor is going to ensure that title rests with the university, which then triggers the Bayh-Dole Act? Mr. Chief Justice, I know of no reason why the Federal Government cannot make that requirement. In fact, in the case of Film Tech v. Hydronautics, a Federal Circuit decision, the decision reflects that the Federal agency there did exactly that. So you have no problem. I mean, Mr. Stewart's being careful for his client, but you're comfortable with the idea that the government could impose that even though there's nothing in the statute that requires it, and even though somebody could argue that the statute's somewhat inconsistent with it in the sense that it wants to promote commercialization. As far as I know, that has never been litigated, but I know of no reason why a Federal agency could say to a contractor, we want to be absolutely certain that the assumption that underlay not only Bayh-Dole contracting, but contracting going all the way back to Attorney General Biddle's report in 1947, that everyone assumed was in place, which is an assignment from an employee, whether it's a Federally funded invention or a privately funded one, would go to the contractor. Breyer, Well, that's where I exactly am. I mean, the brief that I found very, very interesting is that filed by the Association of American Universities in the Advancement for Science and the Council on Education and they seem to take the line that you are, I don't know how far you want to pursue it, but they say the strongest analogy is with government employees, and if you look at government employees, the basic rule is the Federal government paid for it, they should have the invention. And the way they do it is not to deny the employee the right to have the invention, but they insist upon assignment, assignment of an exclusive license. And there are cases which are cited here that suggest that even if the employee tries to run his way around that and simply goes and before the government can get it, assigns the interest to a third party, that that third party assignment is void as a matter of public policy, and that the assignment to the government of the exclusive right is valid as a matter of law, a legal implication from the executive order and the circumstance. That brings me back to where Justice Ginsburg was and Justice Kennedy. The analogy is so strong, the government has paid for it. There is a statute here that really seems to assume, though not explicitly say, that the universities will have title, that we simply copy what happened in this other area and say that an effort to assign by the employee in contravention of what this statute takes as its basic assumption and a contract is void as a matter of public policy, because the exclusive license is assumed to be assumed to be assigned to the university, though I don't need the second part. For this case, the first part suffices. Justice Breyer, let me begin with the assumption that I agree underlies the AAU brief about the situation with respect to government employees. Actually, I think the situation of government employees supports our side, because as this Court ruled in DuBolier, just because the government pays for an invention does not mean that it automatically owns it. In DuBolier, there were employees of the Bureau of Standards who came up with particular inventions and they got patents on them, and the government said, we own that because these are government employees, and this Court ruled that's not the case. Government employees are in no different position from employees of private entities with respect to ownership of their inventions. Breyer, is that before the executive order or after? The executive order simply says that there can be regulations where the employment  can result in an assignment from the individual to the government, just as the same applies in private industry. Employees sign either an agreement to assign, as happened with Dr. Holodny and Stanford here, or as happened with Cetus, there's a present assignment of future expected interests. I'm sorry, Mr. Chief Justice. What I was going to say is that there was no rule of automatic vesting of title, which is what Mr. Holodny said. There's a requirement of an assignment. And the regulations actually give the government employee the right to refuse to assign an invention to the government, and there are appeal procedures, as set out in many of the regulations. We quote the Air Force regulations in our brief, but there are many others, where it's possible that the employee will wind up retaining his rights to an invention that was made, even though he's a government employee. Breyer, if the employee seeks to assign to a third party in contravention of his agreement, rules and regulations, et cetera, what happens to that assignment? Well, there can be – it depends on the facts, Justice Breyer. The facts are that he knew he was supposed to give it to the government. There is a situation where there is an order to reassign, as there was in the Heineman case. No, there's no – there is no what there is is an agreement with the government that says any invention you will assign to the government. That's the agreement. And now, in violation of that agreement, he assigns it to a third party. What happens to that assignment? The question will be whether that assignment can be void under ordinary equitable principles. And what the Court said, my reading of it, must be yours, is in the cases they cite, that assignment to the third party is void as a matter of law because it's contrary to public policy. That was my reading of it, and I'm questioning you about that because I might not have read it correctly. I'm not sure which case Your Honor is referring to. Well, they have their L.I.V., Montgomery, L.I.V., Montgomery, and so on. Well, L.I.V. versus Montgomery is, I believe – Am I right or not, in your opinion? I don't think so, Justice Breyer. I think L.I.V. versus Montgomery is the unpublished decision of the D.C. Circuit which has less than a sentence of discussion of this. The only one in which this was actually covered in any respect, I think, is the Heineman decision in the Federal Circuit. But there was no assignment to a third party. It was just a question of whether the – I'm sorry, Justice Sotomayor. Is there any conceivable reason that under the Baudot Act, whose intent was to protect the government's interest after it's funded the discovery or implementation of an invention, that Congress would have ever wanted the university and the inventor to be able to circumvent the Act by failing to secure an assignment? The purpose of the Act, Justice Sotomayor, was to clarify the relationship between the contractor on the one hand and the Federal government on the other in the basis of uniform Federal contractual procedures. But, frankly, every Act before this one, actually the IPA, required that the contractor seek assignments from inventors. Why would this Act omit such a critical term? If it didn't intend to vest title in the contractor. The answer, Justice Sotomayor, is given by the IPAs, which is there was no need for such a requirement. Universities had shown that they were perfectly able under existing law to get assignments. Sotomayor, if we say that the contractor and the inventor could do what they want, what sane university wouldn't enter into agreements with its employees, letting the employees retain title to their inventions and just sharing royalties thereafter? It wouldn't make any sense for universities to do what you're saying, get assignments, because they could just continue taking the bulk of the royalties. If that were to happen, Justice Sotomayor, the remedy that Mr. Stewart kept in his pocket, which is that the agency would say to the university, you're not getting any more Federal money until we are assured that the assumption that has underlain Federal contracting since 1947 and before is in place, namely that you have an assignment from your company. Roberts, that might lead to the same thing that the Bayh-Dole Act was intended to get away from, which is a variety of different arrangements across the vast array of government agencies, because they will have differing degrees of interest, differing leverage with respect to what they consist on from the different contractors. Well, Congress, Mr. Chief Justice, in the Bayh-Dole Act was considered with a particular type of uncertainty. It didn't do anything and everything that could be argued to create uncertainty in tech licensing. Roberts, are you aware of situations where the universities enter into different types of arrangements with different types of professors and researchers? Certainly. Presumably some of them have greater degree of leverage than others and can say, look, you've got to make sure I get this much of the royalties and I'm only going to give you this much. Well, certainly there are different approaches, and that is the system that Bayh-Dole left in place, which is that the relationship between the contractor and the inventor would be governed under ordinary patent and contract law principles. MIT and Caltech, for instance, they get the present assignments of future interests. We cite those policies in the brief. So if that's so, then the whole thing that was wrong here is that Stanford, instead of drafting the agreement, I read to assign, should have said, I hereby assign, and then there would be no case. Is that the Cedis agreement said, I hereby assign, and the Federal Circuit said for that reason, even though it was second in time, it takes precedence. Stanford just said, I will assign. So if Stanford had instead used exactly the formula that Cedis used, I agree to assign and hereby do assign, would you have any case? The question presented before this Court would not be presented. There would be other arguments we might have as to whether that earlier assignment was enforceable as against Cedis in light of representations that were made at the time Dr. Hulotny came in. But, Justice Ginsburg, your question is sound, which is that there is this distinction between an agreement to assign and a present assignment of future expectant interests. That has been the law for decades. There are plenty of settled expectations based on that. That has not been challenged, not in the petition for certiorari, not in the opening brief of Stanford, and it only comes up in a footnote on the penultimate page of the reply brief. So if the Cedis agreement that came second in time had said, I will assign, then again you would have no case. The question presented here would not arise, because the only effective assignment of the invention would have been the assignment that Stanford got subsequently from all three co-inventors and filed in the Patent Office in 1995, recognizing that it couldn't simply say, Bayh-Dole Act, best title in Stanford, but rather we need an assignment, and it got one. We have a number of sample clauses in this record, and some say, I will assign. Some say, I hereby do assign. And the notion that the answer, who wins and who loses, should turn on, where the one drafter said, I agree to assign, and the other says, I hereby assign. It just seems very odd. That's a distinction, Justice Ginsburg, that goes back to the Federal Circus decision in Arachnid by Judge Giles Rich, who is a notable authority on the Patent Act. He relied on the Curtis Treatise from 1873. But if that were an issue that the Court wished to reconsider, I think it should be. Scalia Is it patent law or is it regular contract law? Doesn't it apply in other fields as well? I mean, I'm not aware that this is a peculiar doctrine applicable to patent law. Goldenberg No, not in particular.  It's an agreement to do an assignment in the future, as opposed to the future. Scalia To do it in the future, and if somebody else gets an assignment before that agreement is executed, the assignment prevails. Ginsburg Even when we're talking about nonexistent property, property that may never in fact exist? Goldenberg That comes from the Film Tech decision, which relied on Justice Story's decision in Mitchell, and it's used again by universities like Caltech and MIT that rely on the validity of a present assignment of future expectant interests. I mean, I know that the issue of the interpretation of agreements to assign was addressed in the cert petition in Prostar v. IP Venture, which this Court denied cert on three I would submit it can be done in an appropriate case where there is amicus briefing on that issue. This is not considered here at all. Ginsburg So for the future, the universities would be protected against a third party simply by changing their form of contract with their employees to say, I hereby assign. So we would have no continuing problems. Isn't all this about? Goldenberg They would be protected from this particular constellation of facts that came up in this case. Breyer And then your clients would be out there arguing, oh, but you see, you can't assign a future interest in the fruits from Black Acre. I mean, you can promise to do it, but Black Acre isn't even around yet. And so when somebody ran in and got those fruits, well, and now we have a fight. And in law, the second person wins. And in equity, maybe the first person can get an injunction. I don't know, but I guess people would raise that kind of argument, wouldn't they? Goldenberg The point, Justice Breyer, is that all these questions are resolved in exactly the same way when we're not talking about a federally funded invention. The Bayh-Dole Act has nothing to say about that. Breyer So if in fact the reason it's relevant to you, of course, is if that's so, Senator Bayh and Senator Dole passed a law which could so easily be subverted by individual inventions and third party companies, that there might be a large class of cases where neither the university nor the government would actually get much of a benefit from research that the taxpayer had funded. Goldenberg I don't think that's a fair inference, Justice Breyer. Breyer Because? Goldenberg The fact that this has not happened at all in 30 years of the Bayh-Dole Act. Breyer Because most people perhaps thought that they had made a valid assignment. Goldenberg Well, in most situations there will be a valid assignment. But the fact that Stanford here did not get an effective assignment from Dr. Halodny is no reason to read the Bayh-Dole Act in a way that Congress did not in the draft and that it doesn't naturally let us. Breyer It's not just that there may or may not be an effective assignment. The problem is that you might get together, you the inventor, get together with the university and say, look, the one we share an interest in making sure that none of this goes to the government. Why would we want to do that? So you make an arrangement. Your theory is that whatever the contractor gets is what the government can get and nothing more. So the contractor and you work out a deal to make sure that the contractor doesn't get the invention or the patent. It just gets royalties. And they're happy because the value of the patent is not diluted by the fact that the government is going to be doing something with it. I think in that situation, Mr. Chief Justice, there would be other doctrines that the government or a bona fide third-party purchaser could invoke, including section 261 of the Patent Act or a lawsuit for a reassignment, as is happening in Fenn v. Yale, or a suit for bottom. Roberts So at the end of the day, though, your theory is that Congress passed a law that could, I guess this is Justice Breyer's point, be easily circumvented, not only by the inventor, but by the inventor and the contractor working together. It's not that it can be circumvented. There are efforts, there are ways in which, if there is an inequitable assignment, it can be attacked in any way. It's nothing inequitable about it. It's a perfectly fair deal between the university and the inventor. In that event, the government has all the remedies that Mr. Stewart was talking about as a matter of leverage. It could take the patent by eminent domain and just compensation might be quite low if, in fact, it has funded all of the research. It can refuse to fund. Absolutely, Justice Scalia. It can refuse to fund without a clear assignment up front. That's quite right. What it can't do is relitigate Dubolier and just say that because we funded it, we own it. It doesn't make that rule even for Federal employees. An assignment is required. I mean, I think the the Kagan Do you have an explanation, Mr. Fleming, of why it is that Congress left such a big problem off the table? In other words, there were clearly Congress was thinking about how to protect the government's interests with respect to these patents, and to say, well, we have these interests with respect to patents that the university owns, but we don't have those same interests with respect to patents that the individual researcher owns, it just seems bizarre. There is an explanation, Justice Kagan, which is that the universities had shown that they didn't need a vesting rule in order to get title from their inventors, just the same as private industry does not need a vesting rule to get title to non-Federally funded inventions. This was something that Attorney General Biddle in 1947 I'm sorry, they do. I mean, the general rule is that the inventor owns the patent. And the and there is a proof that they can go into court, an employer can go into court and show that the inventor was hired for this specific item, and the law would presume or recognize the employer's rights. But why would Congress leave all of that up to the nature of the contract that the inventors? That's precisely what happens in the context of Federal employees. It's governed by the employment relationship between the Federal government and the employee. And it was shown in the IPA system, in the system that Attorney General Biddle talked about in 1947, that the assignment came through under ordinary patent laws. There was no need for a new provision. Sotomayor, the question I started with and Justice Kagan has picked up on, why would Congress be requiring one? Nothing in the Act, nothing in its regulations, nowhere is there a requirement that Federal contractors seek assignments, because there was no need for such a requirement. The universities and industry were able to do it without the vesting rule. I think in order for Stanford to prevail here, to Justice Scalia's point, the Court would have to be satisfied that Congress worked a highly transformative change in the law of patent ownership and assignment, and did it in a very obscure and indirect way. It didn't do it through an express provision like it does in Section 201 of the Copyright Act, which expressly says that an employer can be treated like an author for purposes of the copyright. It didn't do it in the way that was done under the IPAs, which is it was left entirely up to private contract. Supposedly, it created this brand-new vesting rule, not through a clear provision, but through questionable implications from the preamble or other provisions of the Act that don't directly apply. And it did it without a peep in the legislative history that Congress was trying to do this. And I think it's remarkable that for 30 years of Bayh-Dole, no one noticed this supposedly all-encompassing vesting rule until this case arose. Breyer. But it's also remarkable the other way, that here we have many statutes that took the principle that when the government pays for an invention, the invention vests in the government. Now, there's that statute, that background, not all of them, but some, NASA, various others. There are three of those, Breyer, and they all specifically say in terms that title shall invest in the middle of the country. Breyer. I know that. I know that. That isn't my point. My point is that it's somewhat remarkable that because of this new statute, now that happens to only two inventions in those areas that are inventions of the contractor, who, by the way, invents nothing. Human beings invent things, not entities like universities. And on your view, what that means is it applies to nothing. It only applies to those things that the contractor, freely or not freely, decides to get from his employee, if he uses the right words and so forth. Now, that also seems a little surprising that there could be such a hole in what used to be public ownership of such matters. I'm not – I don't mean to be – I started off sounding a little sarcastic. I didn't mean to be. I meant to be. Serious question. No, no. I appreciate the question, Justice Breyer. The point about the vesting statutes, it's important to make a distinction between statutes that expressly vested title, of which we know of three, and statutes under which the government was entitled to ask for an assignment from the employee or the contractor, which were more common. The answer is not as bad as I think. Thank you. Okay. Now, what about the provision that says there shall be, this is a provision of the law, that the universities are supposed to enter into contracts, funding contracts with the government, to make this thing effective? Hmm. Effective. Effective for what? Effective just to apply to some of the things that universities got money to pay for, or to a lot of them, to all of them? Effective in terms of inventions of the contractor to which the university has the right to retain title. Try as Stanford made, retain does not mean get. It doesn't mean to take away from somebody. An invention of the contractor, for exactly the reason you say, Justice Breyer, is not an invention created by a contractor employee. Contractors don't invent. When Congress wanted to refer to employees in the Act, it did. In section 202c7, it refers to contractor employees. In 202e, it refers to employees of Federal agencies. If Congress had wanted to pass a law that completely wiped out the practice of leaving the relationship between contractor and inventor to private contract, it had plenty of examples of how to do so. It had the NASA statutes. It had the Copyright Act. Or it could have just written something clear that said that. It did none of those things because it didn't need to. Over $200 billion of funding comes from the private sector to technology and inventions like this without the benefit of a vesting rule. If there's any lack of clarity or lack of certainty in this world, it is worked out through the patent law, ordinary provisions, or through the common law. And that is exactly the way that Congress envisioned it would be done in the Federally funded situation. There's no need to create a separate rule for Stanford for inventions that are funded out of its endowment versus inventions that are funded out of a Federal grant. Alitoso, isn't there a big difference between this statute and the prior vesting statutes? The prior vesting statute said if the government pays for the research, then the taxpayers are to get the benefit of the patents. This statute says if the taxpayers pay for the research, if the research is 100 percent funded by the taxpayers, taxpayers don't get the first priority. The first priority goes to the universities. So it's totally different from the vesting statute. This is a Federal subsidy for universities and other non-profits, isn't it? In some ways, Justice Alito, that's right. And the point is that the statute is limited to the inventions where the contractor  It is certainly different from the vesting statute. Scalia, you haven't been doing much with the patents that it acquired automatically. Absolutely not, Justice Scalia. That's the reason that they gave it to the university or to the private sector. And that is exactly the reason this Act was enacted, is to get rid of the inconsistent practices among agencies as to the terms of contracts with contractors. It has to do with the quid pro quo. The Federal government gives the money, it agrees not to demand title, and in return the contractor takes on certain obligations. It is the obligations are not opposable against a non-contractor like Cetus or Roche in this case. And that's exactly the same as the situations that we cite on page 35 of our brief, which we've offered to lodge with the Court, where Stanford co-owns patents with non-contractor companies. What are the obligations, what are the obligations that the contractor undertakes? The contractor agrees to give the government a non-exclusive, paid-up, irrevocable license. It agrees to be subject to march-in rights if the government feels that the invention is not being sufficiently commercialized. Roberts. All things that the government had and more under the prior system. Yes, that's certainly right. It will all depend on what the individual Federal contract has. But, yes, in many ways the government was giving up rights in the Bayh-Dole Act, and that was deliberate, because it was felt that the private entities would do a better job of commercializing inventions than the Federal government was doing. And that's not disputed, but it has nothing to do with the rights that apply to the third party that has not taken on obligations from the government, like CITIS, that simply invited Mr. Haladny in, in order to collaborate, but before it did so said, we need an agreement to protect our intellectual property. I mean, one of the hypotheticals that underlies Mr. Ayer's presentation here is that Dr. Haladny was some kind of rogue, faithless employee who was out on a frolic of his own and simply decided to assign away all his inventions in satisfaction of a personal debt. But the record is quite to the contrary. He showed up because he did not know how to do the PCR technique that is at the core of this invention. The Court only needs to read pages 55 to 57 of the Joint Appendix, where he has marched through each of the steps of this invention that's ultimately claimed in the patents and admits that he had not done any one of them. He went to CITIS, he took the — he had the benefit of a free flow of information from CITIS scientists, and he also got confidential proprietary materials that were not available in stores, including particularly the RNA standard, which is used every single time one of these assays is run. It's the thing that gives you the standard curve against which you can measure the data from your unknown sample and figure out what the quantity of HIV is in your patient's sample. That was, you know, not available at Stanford. It was designed by Alice Wang of CITIS. It was built by Clayton Cassapit in the CITIS lab. It was named after him using his initials, CC2, and Mr. Cassapit handed it to Dr. Halagny in a tube for free. Sotomayor Do you think that CITIS would have let the doctor in absent the agreement between CITIS and Stanford? Wasn't that the primary reason that they permitted the doctor in? It wasn't for this ephemeral assignment of an unknown invention. It was because the university and the company had entered into a share agreement of what would happen if they contributed to a Stanford invention. I wouldn't quite agree with the end of the question, Justice Sotomayor. What happened is that Dr. Halagny's supervisor at Stanford, Dr. Merrigan, sat on CITIS's scientific advisory board. When it became clear that Dr. Halagny could not figure out how to do a PC assay that would quantitate HIV at Stanford, he arranged for Dr. Halagny to visit CITIS in order to learn how to do that. But they had a pre-existing cooperative arrangement. It was a materials transfer agreement, that's right. But when Dr. Halagny went there, he signed a separate agreement, the one that assigned his inventions as a result of the collaboration or as a consequence of the collaboration to CITIS, and that was the consideration. To this day, Stanford has not explained what CITIS could have done to protect its intellectual property so that it could have been able to practice its invention without having to go to Stanford for a license and pay a royalty. As far as I know, the only thing under Stanford's theory that CITIS could have done is told Dr. Halagny to take a hike, because they couldn't have any assurance that his employer would subsequently say, you know what, there were $1,000, $10, $1, we don't know, of Federal funding under an agreement that has never been produced, that is of indeterminate scope. And they suggest simply by averring in a patent application that this is all of a sudden a Bayh-Dole invention, even though it was undisputably now, under the findings of the district court, conceived before Dr. Halagny left CITIS and subject to this agreement. And it was done at a time when Dr. Halagny was being paid not by a Bayh-Dole related grant, but by a National Research Service award, which the Bayh-Dole expressly exempts from its provisions in section 212. So the notion that CITIS somehow has lost the private right to the invention conceived using its proprietary materials and information simply by the subsequent use of an unknown amount of Federal funds, that works as a digestiture. Ginsburg. You were here, Mr. Fleming, when I asked Mr. Ayer about that, and he said that's not so, that the Federally funded project existed at Stanford before Dr. Halagny ever went to CITIS. This, Justice Ginsburg, is a question that was raised in front of the Federal Circuit. The Federal Circuit didn't reach it. It is open on any remand. Of course, we don't think there should be a remand, but it's certainly not before this Court. But to answer the question, here is the record on this point. The salary was not paid by NIH grants. It was paid by a National Research Service award that is exempted. The grants were never produced. The grant titles on their face do not apply to the work that was done at Stanford. One of them deals with establishing a center for AIDS research. Of course, this is work that was not done at Stanford's center. It was done at CITIS. The second one deals with AIDS clinical trials, and it's undisputed that there were no clinical trials at CITIS. The clinical trials only happened when Dr. Halagny went back to Stanford. Dr. Merrigan's declaration, which Mr. Ayer referenced on JA98, says only that Dr. Halagny's research at the lab at Stanford was covered by the Bayh-Dolaks. It's nothing about the work at CITIS. And if there was any doubt, Stanford argued repeatedly to the Federal Circuit that the federally funded research started in 1990, and this issue was decided on summary judgment against Roche when all factual inferences should have taken in our favor. Roberts. Thank you, counsel. Thank you, Mr. Chief Justice. Mr. Ayer, you have two minutes remaining. Thank you, Your Honor. The — I think the place to start here is with the fact that Congress faced with a history under which the Federal Government had taken ownership outright of federally funded inventions in approximately 80 percent of the cases, enacted a statute to change that because the government wasn't any good at getting this stuff developed. And so they defined the coverage in terms of — I'm going to cover these two phrases — inventions of the contractor. There is no question, if you look at section 200 on 1A of the blue brief, you will see in the middle of this initial policy and objective section a reference to what they thought they were talking about. At the very bottom of that page, on the bottom line, they talk about ensuring that inventions made by nonprofit organizations and small business organizations — that's the universe they wanted to cover. The same words, inventions made by those organizations, are in the heading of the regulations and they appear elsewhere throughout the regulations. So they meant to cover the universe of inventions that those institutions create. We talked earlier about the word retain. The word retain cannot, consistent with its usage in 202d, mean that whoever is retaining it must have owned it before they started, because it's 100 percent clear, just from thinking about the statute and from reading page 38 of the red brief, that when an inventor is allowed to be considered for retention of title, he never has ownership of it. And so the word retain can't mean that. What does the word retain mean? I would submit the word retain means what it often means. It means that sometimes in a situation, someone is allowed to continue holding something subject to conditions that may change, and perhaps in spite of realities that make you think that's surprising. For example, a parent may be allowed to retain custody after a disputed custody hearing. That's a temporary thing, perhaps. The Court may allow it to change. Roberts. Thank you, counsel. The case is submitted. Thank you.